(C.D. 3881)

ROBERT BOSCH CORP.
ARTHUR J. FRITZ & Co. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 11, 1969)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Sheila N. Ziff* and *Peter Jay Baskin*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The two protests here involved which were consolidated for trial relate to certain electrical equipment imported from West Germany. In issue are three different types of articles, all assessed with duty at the rate of 17.5 per centum ad valorem, as electrical switches within the purview of item 685.90 of the Tariff Schedules of the United States (hereinafter referred to as TSUS).

It is claimed in the protests, or by amendment thereto, that the articles designated as flasher units and back-up light assembly kits are more specifically provided for in item 683.65 of said TSUS, as parts of electrical lighting equipment for motor vehicles, at the rate of 8.5 per centum ad valorem, and that the article invoiced as starter solenoid switch is also dutiable at the rate of 8.5 per centum ad valorem, as electrical starting and ignition equipment for internal combustion engines, as provided in item 683.60 of said TSUS.

An alternative contention that the flasher unit is provided for in item 685.70 as visual signalling apparatus, at the rate of 8.5 per centum ad valorem has not been pressed, and is, therefore, deemed abandoned.

The relevant statutory language reads as follows:

685.90   Electrical switches, relays, fuses, lighting arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof_____   17.5% ad val.

| | | |
|---|---|---|
| 683.60 | Ignition magnetos, magneto-generators, ignition coils, starter motors, spark plugs, glow plugs, and other electrical starting and ignition equipment for internal combustion engines; generators and cut-outs for use in conjunction therewith; all the foregoing and parts thereof _____ | 8.5% ad val. |
| 683.65 | TSUS, as amended by Public Law 89–241. | |
| | Electric lighting equipment designed for motor vehicles, and parts thereof_____ | 8.5% ad val. |

Samples illustrative of the imported articles, together with certain descriptive material indicating the placement and functions of these units were introduced into evidence and it appears not to be disputed that they are automotive equipment parts for Volkswagens.

The sole witness in the case was Mr. Wilmer McFadgen, service manager of Robert Bosch Corp., one of the plaintiffs herein, who had worked for the company for 11 years, and had 14 years previous experience in the same field. His testimony may be summarized as follows:

Robert Bosch Corp. is an importer of automotive, electrical and radio equipment from its "home plant" in Stuttgart, Germany. This equipment is marketed in the United States through distributors. The service manager supervises personnel who install and repair these items and also conducts a school for distributors wherein he teaches subjects covering automotive, electrical and diesel fuel injection equipment including courses on starters, generators and alternators, and tape recorders. The witness had personally repaired the ignition and electrical systems of Volkswagen, Mercedes-Benz, Volvo and Issetta automobiles, and was, at the time of trial, engaged in rebuilding a Volkswagen engine for himself.

Bosch in Germany is an original equipment manufacturer for certain makes of automobiles and provides *inter alia* starters, generators, coils, spark plugs, distributors, ignition switches and windshield wipers for Volkswagens.

The subject flasher unit identified as item number 0336150009 on entry 45117 and number 336251003 on entry 30930 is purportedly represented in the record by plaintiffs' illustrative exhibits 1 and 2. It appears, however, that although exhibit 2 was identified as item No. 336251003, it is in fact item No. 336150010. We advert to this discrepancy since counsel for the government has urged a failure of proof with respect to item No. 336251003. But inasmuch as testimony of the witness establishes that 009, 003, and 010 (plaintiffs' illustrative

exhibit 3) differ only in terminal features, but are identical in internal construction and operation, we are not inclined to consider the discrepancy as significant.

These articles are primarily Volkswagen flasher units which cause the directional lights to blink. With the aid of plaintiffs' illustrative exhibit 3 which has been opened to reveal its interior construction and plaintiffs' illustrative exhibit 4, a block diagram of the unit, the witness described the mechanisms and function of the system as follows: a directional turn indicator switch is mounted on the steering post by the manufacturer. It has a control light which indicates whether the signal is left or right. The switch in issue controls the front and rear lights and the blinker unit. When the turn indicator switch is pulled down for a left turn, for example, it energizes a coil or magnetic switch, and electricity flows through the blinker unit. A little pair of contacts in the blinker unit closes the circuit and applies current to the front and rear lights. When the current flow heats a bimetal piece of wire, the wire relaxes and because the magnetic field can no longer overcome it, the contact snaps open, then it cools and contact is reestablished. The cycle repeats itself, depending upon its load capacity, from 45 to 60 times a minute. As a result the lights blink on and off indicating the direction in which the car is turning. The sole function of the blinker light is to signal the intent to turn, and the unit in issue is strictly an automotive piece.

On cross-examination the witness admitted that he would call exhibits 1 and 2 magnetic switches and that they are devices used to make or break electrical circuits for the purpose of signalling. He further characterized this item as electrical apparatus which connects the current to the lights.

Item No. 0331400019 of protest 67/67367 is described in the record as a starter solenoid switch. It is represented by plaintiffs' illustrative exhibit 5 and depicted by photograph and diagram in plaintiffs' illustrative exhibits 6 and 7. According to the witness the starter solenoid switch by means of two internal windings activates the starter motor which in turn starts the engine. When the ignition key is turned the pull-in winding simultaneously sucks in the steel core of the solenoid and shifts the starter into gear with the flywheel teeth. When the core touches the two contacts at the back end of the solenoid, electrical power from the battery goes across the contacts in the solenoid into the starter motor which then turns over. When the key is released, the core falls back automatically and the engine should be operating. The engine could not be started unless the mechanical function of engaging the teeth in the flywheel is performed. The solenoid switch is always mounted on the starter, and it, or a substitute device, is essential to its operation. Both the solenoid and the starter are designed to be used together in a single housing.

While the witness usually refers to this article as a starter solenoid, he agreed, on cross-examination, that the manufacturer in its literature (plaintiffs' illustrative exhibit 7) calls it a solenoid switch, and that it makes and breaks electrical circuits. However, he insisted that this function alone is meaningless without the additional action of engaging the starter into the flywheel teeth.

The witness defined a solenoid as "an electro magnet with a bar of steel in the center, which is held off center by a spring, that when energized, the steel trys [sic] to reach an equalibrium [sic] within the field."

With respect to the switch set, identified as item number SH/LG 5 Sort 32, invoice number 0343199028, and represented in the record, physically as plaintiffs' collective illustrative exhibit 8, and graphically as plaintiffs' illustrative exhibit 9, the witness testified that it is a back-up light kit, consisting of a bracket with a hole which holds the actual light, not included in the kit, a back-up light switch bracket which holds the switch, and a clamping bracket which goes over the shift. When the unit is assembled it is connected by wires.

The light goes on when the pick-up current from underneath the dash flows through the back-up light switch and into the back-up light which is mounted on the rear bumper. When the car is in reverse the bracket is shifted against the switch, making contact therewith, and this in turn lights the lamp and keeps it lit as long as the car is in reverse. When the transmission is released, the light goes out. The purpose of this kit is to light the back of the bumper so that the driver can see when he is backing up.

Although there is no reason why the switch could not be sold separately, the witness did not know that it ever was, since he knew of no other use than with this particular kit.

In contending that the flasher units and back-up light assembly kits are "Electric lighting equipment designed for use on motor vehicles, and parts thereof" within the meaning of item 683.65, TSUS, plaintiffs assert that since both units are used as apparatus for supplying light for the directional system and for a rear lamp, respectively, they fall within the common meaning of the terms "lighting" and "equipment," and moreover, that that provision is more specific and exclusive than the provision for switches. It is further urged that in any event the back-up light assembly kit is more than a switch, since it includes as well mounting and holding brackets, and therefore does not respond to the common meaning of a switch, namely, "a device for making or breaking a connection in an electrical circuit."

Plausible as this argument may seem, it does not appear that in providing for lighting equipment for motor vehicles Congress intended to include switches, and it is to the intention of Congress that

the court must look to determine the meaning of statutory language. *United States* v. *Clay Adams Co., Inc.*, 20 CCPA 285, T.D. 46078 (1932) ; *United States* v. *S. H. Kress & Co.*, 46 CCPA 135, C.A.D. 716 (1959).

By statutory terminology switches are devices for making or breaking electrical circuits. In electrical applications they are the means by which electrical current flows, is interrupted, or diverted. For other definitions judicially noted, see *Brown Boveri Corp., Gehrig, Hoban & Co., Inc.* v. *United States*, 53 CCPA 19, C.A.D. 870 (1966). Within that context it seems abundantly clear that the flasher units, and back-up light assembly kits in issue, are switches. Their essential purpose is to open and close the electrical circuit for the flow of current into the lights to which they are connected. Nor is the character of the back-up light switch materially affected by the fact that it is accompanied by mounting and holding brackets. Its primary function is that of making and breaking the circuit, and the brackets are simply the necessary parts to enable it to perform that function.

A reference to the Summaries of Trade and Tariff Information, prepared in terms of the TSUS, Schedule 6, Volume 10, pages 209–210, indicates that the provision for electric lighting equipment for motor vehicles was addressed to the basic lighting fixtures of a motor vehicle, and to the elements of which they are comprised, but does not embrace wiring, switches or sockets imported separately for use in connection therewith.

The following statement therein is deemed significant :

> The prior rate [8.5%] for item 683.65 was unchanged from the effective date of the item, December 7, 1965, until the end of 1967; it was established under the provisions of the Tariff Schedules Technical Amendments Act of 1965. From August 31, 1963, through December 6, 1965, articles of the type currently classifiable under item 683.65 were dutiable at 19 percent ad valorem under the provisions of item 653.40 [illuminating articles] if in chief value of base metal, or at 24 percent under item 545.67 if in chief value of glass.

Although the material prepared in this summary was collated in July of 1968, and published in 1969, it appears to reflect the understanding of Congress in adding item 683.65 to the TSUS, for in Senate Report No. 530 on H.R. 7969, the Technical Amendments Act of 1965, Public Law 89–241, it is stated that the lighting equipment designed for motor vehicles for which it was then providing had previously been dutiable at the rate of 19 percent. This observation was made at a time, when, absent a provision for lighting equipment for motor vehicles, electrical switches *eo nomine* provided for in item 685.90 would surely not have been termed illuminating articles within item 653.40.

The language of item 683.65 seemingly derives from item 85.09 of the Brussels Nomenclature, a source list of commodities with explanatory material, upon which the United States Tariff Commission placed heavy reliance in preparing the tariff schedules for congressional approval. There, too, are notations indicative of the fact that the articles classified as vehicular lighting equipment are the several lamps providing illumination, not the apparatus which controls the flow of electrical current. (Explanatory Notes to the Brussels Nomenclature 1955, Volume III, pp. 937–938.)

An intent to limit the scope of the phrase "lighting equipment designed for motor vehicles" to articles which have the capacity to illuminate, such as lamps, as distinct from articles which control the flow of electrical current such as switches, is also discernible in the description of the types of articles termed "illuminating articles" in the Tariff Classification Study, Schedule 6, part 3, page 203 (1960), Explanatory Notes for items 653.30–653.40.

In any event switches are not lighting equipment *per se*, for they are not complete devices for furnishing illumination. They are, at best, parts which, when combined with housings, bezels, lenses, sockets and bulbs, and the like, constitute the lighting equipment of motor vehicles. So considered they are subject to the statutory rule of interpretation (General Interpretative Rule 10(ij)) that a provision for "parts" "does not prevail over a specific provision for such part."

By reason of the foregoing considerations we are constrained to conclude that the flasher units and back-up light assembly kits here involved are more specifically provided for in item 685.90 TSUS as switches than in item 683.65 as "electric lighting equipment designed for motor vehicles and parts thereof," and to that extent the claims of the protests are overruled.

We turn now to a consideration of the merchandise designated as starter solenoid switches. Plaintiffs urge that these units cannot be classified as switches because they perform the mechanical function of engaging the starter into gear with the flywheel, in addition to the electrical function of causing the current to flow from the battery to the ignition system. The argument is made that in view of the dual role the solenoid switch plays in activating the starter motor, both aspects of which are equally important operations, the starter solenoid is more than a switch or an article for making or breaking an electrical circuit within the context of item 685.90. Cited in support of this contention are the cases of *Geo. S. Bush & Co.* v. *United States*, 38 CCPA, 30, C.A.D. 435 (1950); *United States v. Milton Diamond and Massce-Barnett Co., Inc.*, 42 CCPA 9, C.A.D. 561 (1954); *Garrard Sales Corp.* v. *United States*, 35 CCPA 39, C.A.D. 369 (1947); and

*United States* v. *Kelvin & Wilfrid O. White Co. et al.,* 24 CCPA 327, T.D. 48768 (1937).

Additionally it is urged that the starter solenoid switches are more specifically provided for as other electrical starting and ignition equipment for internal combustion engines in item 683.60, than as electrical switches in item 685.90.

Counsel for the defendant counters with the argument that—

> It is not the solenoid switch which engages the starter into the gear of the flywheel, but rather the shift lever, which is not a part of the solenoid switch. The shift lever's movement in [sic] only an incidental reaction to the primary function of the solenoid switch.

Defendant further contends that the solenoid switch is not starting or ignition equipment within the meaning of item 683.60.

Whether or not the solenoid switch engages the teeth of the starter motor in the flywheel directly or by the intervention of the shift lever, the record is clear and the evidence uncontradicted that this mechanical action is initiated by the solenoid switch and is an important function thereof. The testimony of the witness in this connection is as follows:

> * * * At the same time it does this, it shifts the starter into gear with the flywheel teeth. * * * [R. 29.]

> \* \* \* \* \* \* \*

> * * * You couldn't start the engine unless it did the mechanical portion. The mechanical portion is to engage the teeth in the flywheel. [R. 29.]

> \* \* \* \* \* \* \*

> Q. Besides making electrical circuits, does Exhibit 5 have any other function?—A. Yes, it has to engage the starter in the flywheel in order to have action. Just the fact you turn the starter doesn't mean anything. You have to engage it into the flywheel teeth, and *that is what this does.* [Italics supplied.] [R. 33.]

In the light of the definitions of the term "switch" to which we have heretofore adverted and, indeed, the statutory terminology itself, there can be no doubt that the switches and other devices which are provided for in item 685.90 are *electrical* articles, and consequently, switches which also perform mechanical functions are not included in the provision.

The principle is well settled that where an article is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant, it cannot find classification within such provision. It is said to be more than the article described in the statute. *Cragston Corporation* v. *United States,* 51 CCPA 27, C.A.D. 832 (1963) ; *United States* v. *The A.W. Fenton Company, Inc.,* 49 CCPA 45, C.A.D. 794

(1962); *Garrard Sales Corp.* v. *United States, supra;* and *Hirsch & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 82, T.D. 33365 (1913). By contrast where the difference is in the nature of improvement or amplification, and the essential character is preserved or only incidentally altered, the applicable rule is as expressed in *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935), that an unlimited *eo nomine* statutory designation includes all forms of the article in the absence of a contrary legislative intent or commercial designation. *United States* v. *National Carloading Corp. et al.*, 48 CCPA 70 C.A.D. 767 (1961); *United Carr Fastener Corporation* v. *United States (Northern Screw Corp., Party in Interest)*, 54 CCPA 89, C.A.D. 913 (1967).

We are of opinion on the basis of the instant record that the starter solenoid switch here involved falls within the category of articles covered by the so-called "more than" rule. Since it operates mechanically as well as electrically and both functions are significant in activating the starter motor, it is more than an electrical switch or other electrical apparatus for making or breaking electrical circuits within the intendment of item 685.90 TSUS.

While unquestionably a solenoid switch is not used to activate every starting motor, where the starter is of such character as to be designed to hold a solenoid switch and to operate with it, the action of the solenoid becomes essential if not mandatory equipment for the starter. As such it appears to be accurately described by the provisions for other electrical starting and ignition equipment for internal combustion engines, and parts thereof in item 683.60 TSUS. It has not been urged that a Volkswagen automobile is not powered by an internal combustion engine, and it is a fact which we consider of such general understanding as to be judicially noticed that the contrary is the case.

Whereas the electrical action of making and breaking a circuit is the *sine qua non* which identifies and distinguishes "switches" in item 685.90, and operates to exclude switches which also perform a mechanical act, it does not necessarily follow that the word "electrical" similarly limits starting and ignition equipment. These articles may well be described as electrical, if, in fact, they operate by electricity though they are so designed as to be capable of performing one or more mechanical steps.

We find merit in the contention that the subject starter solenoid switches are properly provided for in said item 683.60, and are dutiable at the rate of 8.5 per centum ad valorem.

To the extent indicated, the claim in the protests is sustained. All other claims are, however, overruled.

Judgment will be entered accordingly.