(C.D. 3998)

FEDTRO, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 14, 1970)

*Siegel, Mandell & Davidson* (*Allan H. Kamnitz* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Arthur H. Steinberg*, trial attorney), for the defendant.

Before RAO, FORD, and RICHARDSON, Judges

RICHARDSON, Judge: The protest herein involves merchandise described on the invoice as a "4-Way Flasher Switch for Automobile," which was assessed with duty at the rate of 17½ per centum ad valorem under the provision in item 685.90 of the Tariff Schedules of the United States (TSUS) for electrical switches, or other electrical apparatus for

making or breaking electrical circuits, or for making connections to or in electrical circuits.

The plaintiff claims that the merchandise is properly dutiable at the rate of 8½ per centum ad valorem under item 685.70, TSUS, as visual electrical signalling apparatus and parts thereof, or at the rate of 8½ per centum ad valorem under item 683.65, TSUS, as electrical lighting equipment designed for motor vehicles, and parts thereof.

The statutory provisions of TSUS pertinent herein are as follows:

Classified under:

Item 685.90, Tariff Schedules of the United States:

Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof_____ 17.5% ad val.

Claimed under:

Item 685.70, Tariff Schedules of the United States:

Bells, sirens, indicator panels, burglar and fire alarms, and other sound or visual signalling apparatus, all the foregoing which are electrical and parts thereof_____ 8.5% ad val.

Item 683.65, Tariff Schedules of the United States, as amended by Public Law 89–241:

Electric lighting equipment designed for motor vehicles, and parts thereof_____ 8.5% ad val.

The record in the case at bar consists of the oral testimony of one witness and three exhibits for the plaintiff, and one witness and twelve exhibits for the defendant. The official entry papers, including the invoice, were received in evidence without being marked. Counsel for the respective parties stipulated that exhibit 1 was representative of the merchandise herein; that exhibit 3 describes the manner in which exhibit 1 is to be installed and used; and that the two pictures on exhibit 3 depict the intended uses of exhibit 1.

Mr. Robert E. Weiblen testified for the plaintiff substantially as follows: He is an electrical engineer, having received degrees from Stevens Institute and Columbia in 1955 and 1962, respectively. He is duly licensed as a professional engineer in New Jersey, and has been

employed as a design and project electrical engineer for the past nine years by Devenco. His duties include design work and management of design work on electronic projects. He examined exhibit 1 and exhibit 3, the latter a card describing the manner in which the plaintiff suggests that exhibit 1 be installed and used. Based upon these exhibits, he had prepared a schematic drawing (exhibit 2) depicting the electrical circuits of exhibit 1 and how they fit into the electrical circuits of an automobile.

Mr. Weiblen testified that exhibit 1 was primarily used to interconnect the two front and two rear lamps with the flasher circuit so that the lamps would flash signals simultaneously, warning other motorists that the automobile was disabled. In addition, exhibit 1, he stated, has a jewel indicator light which will be fitted on the dashboard, and which, when the dual switch is turned "on," will blink signals simultaneously with the four lights indicating that the flasher is functioning properly. It also monitors the brake light switch in the automobile. When the dual switch is "off," it indicates a proper functioning of the brake light switch. Exhibit 1 has wiring, fusing, a radio interference suppression device (capacitor), and lamps which are used primarily in 12-volt automotive systems. The jewel indicator lamp on the dashboard has a socket and bulb. The lamp has no return wire, but is returned through the metal case, the apparatus being mounted against a metallic surface which thus becomes part of the circuitry.

Mr. Weiblen testified further that exhibit 2 is also a diagram of the directional and brake lights, the parking lamps circuit, and the circuits forming part of exhibit 1. The indicator light in exhibit 1 is on a separate circuit, he stated, and the capacitor is primarily an energy-storing device which in effect acts as a radio interference suppressor. The fuse is placed in exhibit 1 so that the malfunctioning of any device which is interconnected through the flasher would not cause a short circuit and burn out the flasher unit.

Mr. Weiblen testified that the schematic drawing, exhibit 2, depicts the directional lights, brake lights and parking lamps of a typical automobile, and represents the circuits forming part of exhibit 1. He also testified that exhibit 1 is a device used to make or break a circuit, but that the over-all operation of the device is more than that; that exhibit 1 is only in part a switch; that a switch normally does not have the indicator lamp and socket, fuse, capacitor, and special housing; that exhibit 1 is a "sub-system" of an automobile; that exhibit 1 is in part an apparatus for making or breaking electrical circuits, but it contains components not necessarily performing that function, such as the indicator light, the lamp in its socket, the fuse, and the capacitor; that exhibit 1 was in part an apparatus for protecting electrical cir-

cuits, since it contains a fuse, but that was not its primary function, and it contains many items which do not fall in that category. In his opinion, exhibit 1 was a signalling device.

Mr. Lazar Seiler, called as a witness for the defendant, testified substantially as follows: He was employed as chief engineer at Signal-Stat Corporation, a division of Lehigh Valley Industries, which designed, manufactured, and sold automotive accessories, such as turn signal switches, hazard warning switches, lamps, rotating beacons, flashers, etc. Mr. Seiler's responsibilities included the design, development and testing of all new products. He was also responsible for trouble shooting and contacting the major automobile manufacturers in Detroit. He travelled extensively to many of the large truck fleets "which is a grouping of vehicles run by one organization for transporting goods throughout the country or people throughout the country" (R. 27); and also to trade shows in major cities in the United States to evaluate his competitors' merchandise, with which he, therefore, became familiar. Mr. Seiler had studied mechanical engineering for five years at the Cooper Union School of Engineering. He was active in the lighting committee of the Society of Automotive Engineers, which included responsibilities for automotive switches.

Mr. Seiler testified that he had been familiar with merchandise such as exhibit 1 for five and one-half years. He identified certain exhibits A through J for the defendant as instruction sheets and catalog pages from various companies describing and depicting hazard warning switches similar to exhibit 1. Mr. Seiler also identified exhibit K as an actual hazard warning switch, which is depicted in exhibit B. He testified that articles such as exhibit 1 were sometimes referred to in the trade as "flashers," but as applied to exhibit 1 the term was a misnomer since exhibit 1 is not a flasher. A "flasher," he explained, is a piece of thermal equipment which repetitively makes and breaks the circuit in order to flash the lights, and is distinct from switching devices. He testified further that defendant's exhibit L is a "flasher" which is used to flash lamps either in turn signal systems or hazard warning systems; that exhibit 1 was considered in the trade to be a hazard warning switch, and in his opinion is a type of switch; that exhibit 1 is designed and intended to make or break an electrical circuit and to make connections to or in electrical circuits.

Mr. Seiler further testified that the feature of exhibit 1 which indicates that the stop light switch is operative was only incidental to the operation of the switch and did not affect the classification of the exhibit in the trade as a type of switch; and that in his opinion exhibit 1 was not electrical lighting equipment or visual signalling apparatus.

On cross-examination, Mr. Seiler testified that he knew of switches which contained fuses, not as part of the switch mechanism, but in the same housing as the switch, which was incidental to the switch mechanics; that most of the switches manufactured by his company contained light sockets, such as directional turn signal switches and hazard switches; that 95 percent of the switches which "indicate" have an indicating bulb; that there were switches used in computers and in many electronic devices which have light sockets; that many switches normally contain capacitors to minimize arcing and also for radio suppression. "Arcing," he explained, was caused by making or breaking contact with the current, the voltage jumping across the contacts through the air. Mr. Seiler went on to testify that exhibits A, C, D, E, H, I, and K, which he had taken apart, did not contain a capacitor, and exhibits A through K did not monitor the automobile brake light switch function; that the function of exhibit 1 of monitoring the brake light switch was one of its incidental design functions. He stated that exhibit 1 makes additional circuits when it is put into the automobile, and that not all of the components of exhibit 1 make or break an electrical circuit, i.e., pilot light and capacitor; that when the brake light switch function is operative, that does not make or break an electrical circuit; that if a hazard switch is not built into an automobile as standard equipment, and an automobile does not contain exhibit 1, or a similar article, the automobile cannot perform the function of having all four lights flash at once; and that in exhibits A through K, the pilot light only functions when the switch is in the "on" position.

Mr. Seiler further testified that exhibits A through K were known as hazard warning switches, but were sold under different names, i.e., exhibit A was sold under the name of "Flarestat"; that in the electrical engineering trade, a "system" consists of the wires, lamps, switches, flashers, etc. that are hooked together in one system; that exhibit 1 would not be considered a "system," but part of a "system"; that he did not consider exhibit 1 to be a "sub-system" but a switch; that all switches like exhibit 1 have fuses, but are still called "switches"; and that the item depicted in exhibit A was called a "system" purely as a sales approach.

In response to questioning from the bench, Mr. Seiler testified that the features and functions found in exhibit 1 which are not found in exhibits A through K are the pilot light function, which indicates that the brake light switch is operative, and the capacitor; and that the pilot light will indicate whether or not the brake light switch is operative only because of the unusual method of hooking the switch into the circuit.

On redirect examination, Mr. Seiler testified that in exhibit A, under "Mounting Instructions" the item depicted therein was described as a switch; that a typical electrical lighting system in an automobile consists of bulbs, sockets, the wiring that connects to the bulbs and continues back to the switching device, a fuse, and an indicator light showing the driver that the system is functioning; that the indicator light circled on exhibit 2 (identified with the number 3) primarily functions to show that the outside lights of the automobile are blinking, but it also indicates to the driver that his stop light switch is operative; and that exhibit 1 does not contain a separate indicating device to show that the stop light switch is operative.

In the opinion of this court the testimony of record indicates that exhibit 1 herein has the attributes of an electric switch. The plaintiff argues that it is more than a switch because of certain other functions and features such as an indicator lamp comprised of a bulb, a bulb socket, fuse, capacitor and housing. Notwithstanding this, the defendant argues that such functions and features were incidental and that the article was properly classified by the collector under item 685.90 of TSUS as a switch.

The plaintiff designates its primary claim under item 685.70 TSUS as visual signalling apparatus, and parts thereof, and advances an alternative claim under item 683.65 TSUS as electrical equipment designed for motor vehicles. Plaintiff at the trial mentioned a second alternative claim under item 688.40 TSUS as an electrical article, and parts thereof, but this claim was not pressed and is, therefore, deemed abandoned. We consider first the primary claim under 685.70 of TSUS.

Plaintiff claims primarily that the imported "4-Way Flasher Switch for Automobile" is properly classifiable under item 685.70 of TSUS as visual signalling apparatus and parts thereof. Examination of the article itself is persuasive that it is not per se a signalling device. The only light on exhibit 1 is the indicator light which is fitted inside the automobile on the panel board, and apprises the driver that the outside signal lights are functioning.

A signalling apparatus is an article which is used by one person to communicate with or signal to another. See *S. Hiller & Co. et al.* v. *United States*, 59 Cust. Ct. 79, C.D. 3082 (1967). In *Funk & Wagnalls New Standard Dictionary of the English Language*, 1956, the term "signal" is defined as follows:

> signal, v. * * * 2. To *communicate* by means of signals; loosely, to serve as a sign of; as, to *signal* the arrival of a ship; to *signal* danger. [Italics supplied in part.]

signal, n. 1. A sign agreed upon, understood, or designed to be understood, and used to convey information, especially at a *distance; a means of communication* by audible or visible signs, generally adopted according to a preconcerted system; often given by displaying a flag by day or a light by night, or by sounding a bugle or horn, * * *. [Emphasis supplied.]

As applied to the facts in this case, the exterior lamps of an automobile when flashing would be signalling other drivers or pedestrians. The indicator light is not such a "signal," since such light is not utilized to communicate with or signal to another. Mr. Seiler explained the distinction in his trade between indicator lights and signalling lights, as follows:

A. * * * The only visual signalling apparatus in my opinion in the trade are those signals which indicate either turns or hazards or functions of that type. Indicator lights are not normally called visual signalling devices. They only indicate to one person and not other motor vehicles around, so therefore it's just called a pilot light or indicating light. That's about it.

Q. You are distinguishing between the lights on the outside of the car and the lights on Exhibit 1?—
A. Yes, sir.

Q. Is it your testimony that Exhibit 1 does not in and of itself signal, is that what you testified to?

  *         *         *         *         *         *         *

A. Yes, sir.

We next consider plaintiff's alternative claim under item 683.65 of TSUS as electrical equipment designed for motor vehicles *vis-a-vis* classification herein under item 685.90 of TSUS as a "switch." The common meaning of the term "switch is defined in *Brown Boveri Corp., Gehrig Hoban & Co., Inc.* v. *United States*, 53 CCPA 19, C.A.D. 870 (1966), as "A device for making, breaking, or changing the connections in an electric circuit." (See also *Webster's New International Dictionary*, 1950 edition.)

Prior to writing the instant opinion, this court recently had considered and adjudicated two other cases, *British Auto Parts, Inc., Ted L. Rausch* v. *United States*, 63 Cust. Ct. 105, C.D. 3882 (1969), and *Robert Bosch Corp., Arthur J. Fritz & Co.* v. *United States*, 63 Cust. Ct. 96. C.D. 3881 (1969), in which the court analyzed closely related subjects under items 685.90 and 683.65 of TSUS, which provisions are involved in the case at bar.

In the *Robert Bosch Corp.* case plaintiffs claimed that certain articles designated as flasher units and back-up light assembly kits were more specifically provided for in item 683.65 of TSUS as parts of electrical equipment for motor vehicles, and that a certain starter solenoid switch

was more than an electric switch because it also served a mechanical function by engaging the starter motor into gear for a flywheel. This latter claim the court sustained, but on the subject of electrical lighting equipment for motor vehicles the court rejected the plaintiffs' claim, observing that although certain dimmer switches and stop light switches were intended for automobiles, the several indicia of Congressional purpose in enacting TSUS item 683.65 reflect an intent to limit the provision to basic articles which illuminate, such as lights, as distinct from articles which provide current such as switches or other electrical applications by which electrical current flows, is interrupted or diverted. The court in the *Robert Bosch* case referred to various definitions in *Brown Boveri* which have been judicially noticed, and held that by statutory terminology switches are devices for making or breaking electrical circuits, properly classifiable under item 685.90 TSUS.

Similarly, in the *British Auto Parts, Inc., Ted L. Rausch* case, *supra*, certain automobile dimmer light switches and stop light switches were held properly dutiable under item 685.90 of TSUS, the court observing that all pertinent tariff data clearly indicate that Congress intended to restrict item 683.65 to basic lighting equipment which projects lights on an automobile and did not intend to include equipment for furnishing or controlling current such as switches.

Based upon the foregoing, our conclusion is that the device herein is a switch and that plaintiff's alternative claim under item 683.65 TSUS is without merit.

It is apparent from the record that exhibit 1 was designed to function primarily as a switch. Indeed, exhibit 1 is even described as a "Flasher switch" on the installation and operation instruction card which accompanied it (received in evidence here as exhibit 3). The fact that exhibit 1 monitors the brake light switch and has other features and functions is, in the court's opinion, merely incidental to the primary function of the electrical switch. It is, therefore, not more than a switch. It does not change the tariff status of the switch. *Robert Bosch Corp., Arthur J. Fritz & Co.* v. *United States, supra.* See also *Astra Trading Corp.* v. *United States*, 56 Cust. Ct. 555, C.D. 2703 (1966), where the court held that a screwdriver with a light attachment was still *eo nomine* a screwdriver.

The rationale in *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, T.D. 40520 (1924), that tariff acts were written for the future and a tariff provision would include all forms of an *eo nomine* article (*Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935)) is not applicable in the situation at bar, nor is it comparable to the factual situation in *United States* v. *The A. W. Fenton Com-*

*pany, Inc.*, 49 CCPA 45, C.A.D. 794 (1962), wherein it was held that a certain motor with other equipment was "more than" a motor, thereby warranting a classification out of the *eo nomine* provision for motors. (See also *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669 (1957).)

Any claim by the plaintiff that exhibit 1 is a part of electrical lighting equipment designed for motor vehicles under item 683.65 TSUS, or a part of visual lighting apparatus under item 685.70, is untenable in view of our holding that the said two provisions themselves do not apply, and particularly by virtue of General Interpretative Rule 10 (ij) of the General Headnotes and Rules of Interpretation which follows:

> A provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

(See *J. E. Bernard & Co., Inc.* v. *United States*, 59 Cust. Ct. 31, C.D. 3060 (1967).)

Based on the foregoing we find and hold that the imported device herein is an electrical switch for making or breaking electrical circuits, or for making connections to or in electrical circuits, within the provision of item 685.90, as classified.

All claims in the protest are overruled.

Judgment will be entered accordingly.