**A & A INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Court No. 82–7–00984.

United States Court of International Trade.

Oct. 29, 1987.

Sharretts, Paley, Carter & Blauvelt, P.C., Peter Jay Baskin, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Saul Davis, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Japan, Taiwan and Korea, described on the customs invoices as "equalizer/boosters," "booster/equalizers," or "multi-band graphic frequency equalizer/boosters."

The merchandise was classified by the Customs Service as "audio-frequency electric amplifiers," under item 684.70 of the Tariff Schedules of the United States (TSUS). Consequently, it was assessed

with duty at a rate of 7.2 or 6.9 per centum *ad valorem,* depending upon the date of entry.

Plaintiff protests this classification and contends that the merchandise is properly classifiable as "[e]lectrical articles ... not specially provided for: .... Other," under item 688.45, TSUS, dutiable at a rate of 5.3 or 5.1 per centum *ad valorem,* depending on the date of entry, if imported from Japan. Plaintiff maintains that, under the Generalized System of Preferences, duty free treatment should be accorded the merchandise imported from Taiwan and Korea.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified Under:

Schedule 6, Part 5:

684.70 Microphones, loudspeakers, headphones; audio-frequency electric amplifiers; electric sound amplifier sets comprised of the foregoing components; and parts of the foregoing articles (including microphone stands) ...........7.2% ad. val. (1980)
6.9% ad. val. (1981)

....

Audio-frequency electric amplifiers

Claimed Under:

Schedule 6, Part 5:

Electrical articles and electrical parts of articles, not specially provided for:

....

688.45 Other ........................5.3% ad. val. (1980)
5.1% ad. val. (1981)

The question presented is whether, within the meaning of the tariff provisions, the imported merchandise is dutiable as "audio-frequency electric amplifiers," under item 684.70, TSUS, as classified by Customs, or as "other electrical articles," under item 688.45, TSUS, as claimed by plaintiff. In order to decide this issue, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir.1984); *see E.R. Hawthorne & Co. v. United States,* 730 F.2d 1490 (Fed. Cir.1984).

After an examination of the merchandise, relevant case law, lexicographic definitions, and the testimony of record, it is the determination of the court that the plaintiff has not overcome the presumption of correctness that attaches to the government's classification, that the merchandise was correctly classified, and that the classification is therefore sustained. *See* 28 U.S. C. § 2639(a)(1) (1982); *Jarvis Clark Co. v. United States,* 733 F.2d at 878; *International Components Corp. v. United States,* 11 CIT ——, Slip Op. 87–99, at 3–4 (Aug. 25, 1987).

The imported "equalizer/boosters" are electrical devices which are used solely with automobile audio systems, and have two functions. One function is to adjust audio-frequency responses of several individual bands of sound to conform to the listener's desired overall sound in the automobile. The other function is to increase the amplification level of an audio signal within the audible range of frequencies in order to drive loudspeakers.

The equalizer/boosters utilize a low-level circuit to accomplish the multi-band tone adjustment function. Because the input level of an existing car radio amplifier is too high to allow the equalizing (audio-frequency band response adjustment) function to operate properly, the equalizer/boosters initially reduce the normal high input from the radio to a lower level, thus, allowing the equalizer circuits to operate. Once this has been accomplished, the output level of the unit would not be sufficient to provide adequate listening volume. Hence, the "booster" function of the articles increases the level of this signal.

The booster function of the equalizer/boosters not only makes up the reduced wattage but increases it to the level of 20 watts per channel. The typical wattage of a factory installed car radio is about 3 watts.

Since plaintiff maintains that the primary function of equalizer/boosters is not the same as the primary function of audio-frequency electric amplifiers, plaintiff contends that the articles do not come within the common meaning of audio-frequency electric amplifiers.

Alternatively, plaintiff contends that even if the equalizer/boosters do function as audio-frequency electric amplifiers they

are "more than" the articles described in item 684.70, TSUS, because their equalizing use constitutes a co-equal or significant function. Hence, plaintiff asserts that they cannot be classified as "audio-frequency electric amplifiers," under item 684.70, TSUS.

■ On the ground that it was not properly introduced at trial, the defendant has requested the court to strike certain documentary evidence that plaintiff has included in its post-trial brief. Reference, however, was made to these documents during the trial, and the defendant does not contest that they were established to be a reliable source of information. Since these documents are not irrelevant, the references and inclusion in plaintiff's post-trial brief are not improper. *See Jimlar Corporation v. United States,* 10 CIT ——, Slip Op. 86–106, at 6 (Oct. 21, 1986). This court has noted that it may consider any relevant and reliable information in determining the common meaning of a customs classification term, and may disregard whatever references may be improper. *Id.* at 7.

■ In order to determine whether the imported equalizer/boosters are audio-frequency electric amplifiers, the court must ascertain the meaning of "audio-frequency electric amplifiers" as used by Congress in the tariff schedules. This inquiry is facilitated by certain basic principles of customs law, perhaps the first of which is that, in the absence of evidence to the contrary, the meaning of a tariff term is presumed to be the same as its common or dictionary meaning. *See Rohm & Haas Co. v. United States,* 727 F.2d 1095, 1097 (Fed.Cir.1984). Another basic principle is that the "common meaning of a tariff term is not a question of fact, but a question of law to be decided by the court." *Schott Optical Glass, Inc. v. United States,* 82 Cust.Ct. 11, 16, 468 F.Supp. 1318, *aff'd,* 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979). It is also well established that the tariff schedules are written in the language of commerce, and the terms used are to be given their commercial or common meaning. *See Ameliotex, Inc. v. United States,* 65 CCPA 22, 25, C.A.D. 1200, 565 F.2d 674, 677

(1977); *Esco Mfg. Co. v. United States,* 63 CCPA 71, 73, C.A.D. 1167, 530 F.2d 949, 951 (1976). Consequently, it is clear that the court must consider and evaluate judicial authority, lexicographic definitions, as well as the testimony given at trial, to determine whether the imported equalizer/boosters are audio-frequency electric amplifiers within the meaning of the tariff schedules.

■ "Audio-frequency electric amplifiers," as used in item 684.70, is an *eo nomine* designation. In the absence of demonstrated legislative intent to the contrary, an *eo nomine* designation of an article will include all forms of the article. *B & E Sales Co., Inc. v. United States,* 9 CIT 69, 73 (1985); *NEC America, Inc. v. United States,* 8 CIT 184, 186, 596 F.Supp. 466, 468 (1984), *aff'd,* 760 F.2d 1295 (Fed.Cir.1985); *Nootka Packing Co. v. United States,* 22 CCPA 464, 470, T.D. 47464 (1935). The legislative history cannot be said to offer specific guidance in ascertaining the meaning of "audio-frequency electric amplifiers." Nevertheless, it is clear that the tariff statutes were enacted "not only for the present but also for the future, thereby embracing articles produced by technologies which may not have been employed or known to commerce at the time of the enactment." *Corporacion Sublistatica, S.A. v. United States,* 1 CIT 120, 126, 511 F.Supp. 805, 809 (1981); *see also Davis Turner & Co. v. United States,* 45 CCPA 39, 41, C.A.D. 669 (1957).

In the *McGraw–Hill Dictionary of Scientific and Technical Terms* (3d ed. 1984), audio-frequency amplifier is defined as "[a]n electronic circuit for amplification of signals within, and in some cases above, the audible range of frequencies in equipment used to record and reproduce sound. Also known as an amplifier; audio amplifier." *Id.* at 123. Amplifier is defined by the same source as "[a] device capable of increasing the magnitude or power level of a physical quantity, such as electric current or a hydraulic mechanical force, that is varying with time, without distorting the wave shape of the quantity." *Id.* at 69.

The *Cooke and Markus, Electronics and Nucleonics Dictionary* (1960) defines audio-frequency amplifier as:

An amplifier having one or more electron tube or transister amplifier stages designed for amplifying an a-f signal. In a superheterodyne receiver it follows the second detector, and serves to amplify the a-f signal after demodulation. Also used separately to amplify the a-f output of a microphone, phonograph, magnetic tape recorder, or other a-f signal source. Also called audio amplifier.

*Id.* at 31.

Amplifier is defined in the *Institute of Electrical and Electronics Engineers Standard Dictionary of Electrical and Electronics Terms* (2d ed. 1977) as "[a] device that enables an input signal to control power from a source independent of the signal and thus be capable of delivering an output that bears some relationship to, and is generally greater than, the input signal." *Id.* at 19.

At trial, plaintiff called three witnesses. The first witness, Mr. Robert B. Miller, a Vice President of Radio Shack, a division of the Tandy Corporation, has had 20 years of experience primarily in commercial buying and selling of consumer electrical products. He testified that audio amplifiers are "devices that amplify—a low level signal and increase the level to a point where it can drive a transducer—which could be a headphone or a speaker system." According to Mr. Miller, the equalizer/boosters are not audio amplifiers because their primary function is not to increase the level of an audio signal, but rather, to modify its shape.

Plaintiff's second witness, Mr. Julian Hirsch, has 32 years experience testing and evaluating audio equipment. His reports on the equipment are published in Stereo Review, a consumer oriented hi-fidelity magazine. Mr. Hirsch testified that the primary function of an audio-frequency amplifier is to accept a low-level audio signal and to increase it to a higher level, either voltage level or power level depending on the application. In his opinion, the equalizer/boosters are not audio-amplifiers because they are designed to decrease as well as increase the level of various audio-frequency bands.

Mr. Larry Klein, plaintiff's third witness, has been a writer specializing in the audio equipment field for a period of 20 years. He agreed with the testimony of Mr. Hirsch and Mr. Miller that the amplifying aspect of the equalizer/boosters is a "subsidiary function that enables them to work as frequency equalizers in a system which they could not otherwise work in."

According to plaintiff's witnesses, the equalizer must initially reduce the normal high input level from the radio's amplifier to a safer level so that the equalizing circuits can operate properly. The amplifier portion of the equalizer/boosters is necessary to increase the output in order to provide adequate listening volume.

The plaintiff's witnesses testified that a frequency equalizer does not perform the same function as the tone controls of an amplifier because tone controls effect a broad range of frequency bands while an equalizer has the ability to increase or decrease the level of narrow or limited bands of frequencies.

Rather than to rely merely on the statutory presumption of correctness that prevails in customs classification cases, the defendant submitted credible and reliable evidence to support its contention that the merchandise was properly classified by Customs. *See NEC America, Inc. v. United States*, 8 CIT 184, 190–91, 596 F.Supp. 466, 471 (1984), *aff'd*, 760 F.2d 1295 (Fed. Cir.1985).

The government's expert witness was Mr. Leonard Feldman, an experienced electrical engineer. In addition to a degree in electrical engineering, he has had over 30 years experience in the audio field, and has authored numerous articles and books on audio equipment. Mr. Feldman, who conducts a laboratory in which he evaluates audio and video equipment, testified that the primary purpose of an audio amplifier is "to increase the level of a signal so that it might be processed or suitable for application to another device—such as a transducer...." He hastened to add, "but

that's only one kind of audio amplifier," and later explained that the term amplifier also refers to integrated amplifiers which contain tone controls such as bass and treble in a preamplifier section. Mr. Feldman testified that the equalizer section of the equalizer/boosters is merely a more sophisticated type of tone control.

Defendant also introduced the deposition testimony of Mr. Edmund Legum, plaintiff's designated spokesman for purposes of its deposition, and a buyer for Radio Shack who has been employed by that company since 1974. Mr. Legum testified that a basic amplifier is not designed or intended to change or modify the shape of the audio signal, but merely increases the power of the signal. He added, however, that equalizer/boosters are integrated amplifiers, as opposed to basic ones, because the equalizer makes it possible to control certain sound frequencies. Mr. Legum agreed that the equalizer operates essentially in the same manner as the tone controls of an integrated amplifier, however, in a more refined fashion.

Plaintiff contends that the equalizer/boosters, as part of their primary design, are intended to perform a function which is not encompassed by the generally accepted definition of "audio amplifier." In support of its contention plaintiff cites *Fanon Electronic Industries, Inc. v. United States*, 65 Cuts.Ct. 542, C.D. 4135 (1970). In *Fanon*, the Customs Court defined audio amplifier as "an amplifier used for the purpose of amplifying electrical signals in the frequency falling within range of the human ear." 65 Cust.Ct. at 546. Plaintiff relies on this admittedly basic definition for its claim that, since the equalizer/boosters are not "used for the primary purpose of amplifying electrical signals ...," they are not audio-frequency electric amplifiers.

In *Fanon*, however, the question presented was whether wired intercoms were to be classified as "telephonic apparatus and instruments," under item 684.62, TSUS, or as "electric sound amplifiers sets," under item 684.70, TSUS. The quoted definition, therefore, was merely dicta, and was intended to illustrate that amplifiers are not "per se communication" equipment, as are wired intercoms, but, rather, are "basically entertainment type of equipment." *Id.* at 546.

In view of the conflicting interpretations submitted as to the meaning and scope of the pertinent tariff terms, the court has examined the Nomenclature for the Classification of Goods in Customs Tariffs, generally referred to as the Brussels Nomenclature. The "Brussels Nomenclature" or "Brussels" is recognized as a highly probative source for ascertaining legislative intent, especially when the language of the TSUS and Brussels are similar. *See Toyota Motor Sales, U.S.A. v. United States*, 7 CIT 178, 185, 585 F.Supp. 649, 655 (1984); *Karoware, Inc. v. United States*, 77 Cust.Ct. 112, 119, C.D. 4681, 427 F.Supp. 402, 406–07 (1976), *aff'd*, 564 F.2d 77 (Fed.Cir.1977). In order to utilize the Brussels Nomenclature there must be a nexus between the language in the Brussels provision and its counterpart in the TSUS. *Toyota*, 585 F.Supp. at 185–86; *S.G.B. Steel Scaffolding & Shoring Co., Inc. v. United States*, 82 Cust. Ct. 197, 213, C.D. 4802 (1979).

In this case, the necessary nexus is clearly present in the classification of the imported equalizer/boosters, as may be noted in the structure, wording and enumeration in item 684.70, TSUS. The Brussels provision is as follows:

Section XVI:

> 85.14 — Microphones and stands therefor; loudspeakers; audio-frequency electric amplifiers.

The Explanatory Notes to Heading 85.14 provide in part:

> This heading covers microphones, loudspeakers and audio-frequency electric amplifiers of all kinds imported separately, regardless of the particular purpose for which such apparatus may be designed (e.g., telephone microphones and radio receiver loudspeakers).

> The heading also covers sound amplifier sets consisting of the three elements mentioned above.

As set forth previously, TSUS item 684.70 reads as follows:

Microphones; loudspeakers; headphones; audio-frequency electric amplifiers; electric sound amplifier sets comprised of the foregoing components; and parts of the foregoing articles (including microphone stands) ...

In view of the similarity, reference may be made to the Brussels Nomenclature and its Explanatory Notes in order to ascertain the legislative intent underlying item 684.-70, TSUS. *See, e.g., Herbert G. Schwarz, dba Ski Imports v. United States,* 57 CCPA 19, 21–22, C.A.D. 971, 417 F.2d 1391, 1393–94 (1969).

The Brussels Explanatory Notes for Heading 85.14 state that "[a]udio-frequency amplifiers contain a volume control for varying the gain of the amplifier, and also commonly incorporate controls (bass boost, treble lift, etc.) for varying their frequency response." Consequently, if the equalizer sections of the imported articles are viewed as controls for varying frequency response, it is clear that they are classifiable as audio-frequency electric amplifiers.

The *McGraw–Hill Dictionary of Scientific and Technical Terms* (3d ed. 1984) defines tone control as "a control used in an audio-frequency amplifier to change the frequency response so as to secure the most pleasing proportion of bass to treble; individual bass and treble controls are provided in some amplifiers." *Id.* at 1656. The *Institute of Electrical and Electronics Engineers Standard Dictionary of Electrical and Electronic Terms* (2d ed. 1977) and the *Cooke and Marcus, Electronics and Nucleonics Dictionary* (1960) also contain definitions of tone controls which indicate that they are components of audio amplifiers for altering or varying frequency response. The plaintiff states that the function of an equalizer is "to adjust the relative amplification of different frequencies within the audio range." Hence, it is evident that equalizers perform the same function as tone controls.

After careful consideration of the testimony of the witnesses, lexicographic definitions, and all other pertinent sources, the court cannot agree that the equalizer/boosters are not embraced within the

meaning of "audio-frequency electric amplifiers."

Although the parties disagree on the "primary purpose" of the equalizer/boosters, it is clear that they perform the function of an audio-frequency electric amplifier, to increase the amplification of signals within the audible range of frequencies in equipment such as a car radio. Furthermore, these equalizer/boosters do not merely restore the level of wattage lost by utilization of the equalization circuits, but may increase it five times the level of an ordinary car radio to 20 watts per channel, clearly the function of an audio-frequency electric amplifier.

It is significant that the lexicographic definitions examined, and the expert testimony of Mr. Feldman indicate clearly that it is not uncommon for amplifiers to contain one or more tone controls to adjust the amplification of frequencies. The Brussels Nomenclature and its Explanatory Notes are also persuasive to show that the legislative intent was to bring articles such as these equalizer/boosters within the definition of audio-frequency electric amplifiers. The Brussels Nomenclature specifically refers to "audio-frequency electric amplifiers *of all kinds* ...," and expressly states that these articles "commonly incorporate controls (bass boost, treble lift, etc.) for varying their frequency response" (emphasis added).

It is also noteworthy that plaintiff's marketing literature, its owner's and service manuals, as well as its personnel, regularly refer to equalizer/boosters as simply "amplifiers or boosters," terms recognized by both parties to mean power amplifiers. For example, one Radio Shack owner's manual describes similar merchandise as a "booster" or "equalizer/booster" interchangeably. While these statements or descriptions are not conclusive, they are nonetheless evidence of industry usage, particularly when they contradict the plaintiff's present position in this litigation. *See B & E Sales Co. v. United States,* 9 CIT at 73; *NEC America, Inc. v. United States,* 8 CIT at 190, 596 F.Supp. at 470–71 (1984), *aff'd,* 760 F.2d 1295 (1985).

In view of the extensive expert testimony, it may be well to indicate that expert testimony as to the common meaning of a tariff term is merely advisory. It may, however, be probative when supported by lexicographic and technical sources. *See NEC America, Inc. v. United States*, 8 CIT at 190, 596 F.Supp. at 471. Although counsel tried this case with competence and zeal, and all of the witnesses shed light on the questions presented, the court found the testimony of Mr. Feldman, the defendant's expert, reliable, clear, and convincing. *See Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. at 24, 468 F.Supp. at 1326; *see also Oak Laminates v. United States*, 8 CIT 300, 301, 601 F.Supp. 1031, 1032 (1984). In addition to academic credentials and years of experience in the field of audio equipment, Mr. Feldman's testimony explained the primary importance of the imported article as an audio amplifier, and of the equalizer as a more sophisticated tone control. Upon careful consideration of the evidence presented, the court holds that the "equalizer/boosters" articles are described within the common meaning of "audio-frequency electric amplifiers" for customs classification purposes.

Plaintiff also contends that, even if the equalizer/boosters perform the function of "audio-frequency electric amplifiers" and come within their common meaning, they are not properly classifiable under item 684.70, TSUS, because they are "more than" audio amplifiers. Plaintiff attempted to support this claim with testimony that the equalizer is not an incidental function, but, rather, a significant or co-equal function of the article. Plaintiff presented evidence that the equalizer portion of the merchandise is emphasized as a selling point, and that several trade publications provide a section for "equalizer/boosters" separate from "amplifiers." Plaintiff argues that since a consumer may purchase an equalizer and an amplifier separately, that the articles are a combination article having two co-equal, or at least significant functions.

It is not questioned that, for tariff purposes, a combination or multifunction article is not classifiable under a specific statutory provision which describes only one of those features or functions since it is "more than" the article described. *See Sanyo Electric Inc. v. United States*, 84 Cust.Ct. 167, 174, 496 F.Supp. 1311, 1316–17 (1980), *aff'd*, 68 CCPA 14, 642 F.2d 435 (1981). In *Robert Bosch Corp. v. United States*, 63 Cust.Ct. 96, C.D. 3881 (1969), the Customs Court described the "more than" principle of customs law as follows:

> The principle is well settled that where an article is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant, it cannot find classification within such provision. It is said to be more than the article described in the statute.

*Id.* at 103–04.

As may be gleaned from this oft-quoted general statement and a large quantity of case law, an incidental, subordinate, or secondary function which relates to an article's predominant use, does not make that article "more than" the article named in the tariff provision. *See Trans–Atlantic Co. v. United States*, 60 CCPA 100, 103, 471 F.2d 1397, 1398–99 (1973); *Eastalco Aluminum Co. v. United States*, 10 CIT ——, Slip Op. 86–96, at 8 (Sept. 23, 1986) [Available on WESTLAW, 1986 WL 10513]; *ASEA, Inc. v. United States*, 7 CIT 128, 131, 587 F.Supp. 1072, 1073–74, *aff'd*, 748 F.2d 676 (1984).

Although the equalizer/boosters perform two functions, the court is convinced that the equalizing or tone control function is a subsidiary function, and that the audio-frequency amplification is the primary function. All of the evidence indicates that it is common for an audio-frequency electric amplifier to contain one or more tone controls. The amplification function of the imported merchandise is indisputably of major importance to the use of the articles by consumers. Moreover, the court is not persuaded that the tone controls included in the imported articles are significantly distinguishable or different from the tone controls contemplated by the definition or description of the article.

It may be added that merely because some trade magazines provide a separate section for equalizer/boosters and amplifiers is in no way dispositive since other trade magazines group the articles together. Moreover, all of these sources allowed for frequency alteration in articles called "amplifiers."

Since it is the primary function of an item which governs its classification, it is the conclusion of the court that the equalizer/boosters are not "more than" audio-frequency electric amplifiers for Customs classification purposes. *See Tridon v. United States*, 5 CIT 167, 169 (1983) [Available on WESTLAW, DCT database]; *see also E. Green & Son v. United States*, 59 CCPA 31, 35, C.A.D. 1032, 450 F.2d 1396, 1399 (1971).

■ Finally, plaintiff also contends that when the "tone controls are expanded to such an extent and have a role of such significance as to alter the very nature and function of the original article, a new and different article is created." Surely, this argument is not applicable to this case. When the difference in an article is in the nature of an improvement, and the essential character is preserved or only incidentally altered, the statutory designation of the article still applies and determines its Customs classification. *See Robert Bosch Corp.*, 63 Cust.Ct. at 104. While the addition of equalizers may be an improvement on the imported articles, the articles are still basically used as amplifiers and, therefore, are classifiable as audio-frequency electric amplifiers.

Since the court holds that plaintiff has not rebutted the presumption of correctness, and that the equalizer/boosters are properly classifiable as "audio-frequency electric amplifiers," under item 684.70, TSUS, plaintiff's claims are denied, and the action is dismissed. Judgment will issue accordingly.