**POLAROID CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 4179;  Protest No. 68/35053–18794–68.

United States Customs Court,
First Division.
Feb. 18, 1971.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Peter J. Fitch, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Herbert P. Larsen, New York City, trial attorney), for defendant.

Before RAO, Chief Judge, and WATSON and MALETZ, Judges.

RAO, Chief Judge:

The merchandise involved in this case consists of Polaroid Land Film Type 20 for a photographic camera produced by the Polaroid Corporation known as "The Swinger". It was assessed with duty at 2.5 cents per pound and 10 per centum ad valorem under item 256.85 of the Tariff Schedules of the United States, as articles of coated paper, not specially provided for. It is claimed to be dutiable at 6.25 per centum ad valorem under item 723.15, as photographic film, sensitized but not exposed, other than motion-picture film. All other claims in the protest, as amended, including claims as to a print coater imported with the Polaroid Land film, have been abandoned and will be dismissed.

The pertinent provisions of the Tariff Schedules are as follows:

Articles, of pulp, of papier-mâché, of paper, of paperboard, or of any combination thereof, not specially provided for:

| | |
|---|---|
| * * * * * | |
| 256.85 Other: | |
| Of papers, coated, or of any of the papers provided for in items 253.25, 253.30, 253.35, 253.40, or 253.45 | 2.5¢ per lb. + 10% ad val. |
| Photographic film, sensitized but not exposed: | |
| * * * * * | |
| 723.15 Other than motion-picture film | 6.25% ad val. |

It was stipulated at the trial that the imported merchandise is an entirety.

Arthur D. Jarrett, who has been connected with the Polaroid Corporation for 10 years and was at the time of trial manager of the Technical Control Center, testified that he participated in the designing of Polaroid Land film and now has the responsbility for technical design of these films. He holds a doctorate in organic chemistry from the University of Glasgow, Scotland and has had research training at Rice University, Houston, Texas. He has lectured on color photography and on Land photography, both black and white and color. He participated in the development of the "T20 Photographic Roll Film" involved herein and has seen it produced in Scotland.

A five-package sample was received in evidence as exhibit 1. Each box contained a print coater, an instruction sheet, and a sealed pouch containing one 8-exposure T20 Land film roll. Dr. Jarrett testified that the roll fits into the type 20 Swinger Land Camera. It was produced by joining two sub-assemblies, a negative sub-assembly and a positive sub-assembly. The negative sub-assembly is composed of a plastic spool onto which is wound negative light sensitive material, joined to which is negative leader paper. The light sensitive material is a silver halide photographic emulsion in gelatin matrix on a coated base consisting of plastic film supported by paper. For all practical purposes, the different layers are permanently attached to the paper.

The positive sub-assembly also has a leader, so-called tab paper, adjoined to a strip of receiving sheet, which is black on the back and white on the front and is composed of a multiplicity of layers. Laminated to this is tan-colored photographic mask paper. Attached thereto are developer pods containing development fluid which promotes the reduction of the sensitized silver halide. As imported, all these layers remain together.

Sealing tape holds the negative and positive sub-assemblies in tightly rolled juxtaposition. In normal operation, after the picture is taken and processed, it is removed from the entirety, but the layers of paper are not disassembled. The end product of the entirety is a series of prints, which are composed of plastic coatings above and below a paper substrate.

Dr. Jarrett demonstated the method of loading the roll into a Swinger Model 20

Polaroid Land camera (exhibit 2). He then pulled out the negative leader to bring the light sensitive material in position for taking a picture. He said that after a picture is taken, this material is pulled from the camera. That ruptures the developer pod and the fluid is spread evenly to form a sandwich between the negative and positive papers. After the proper development time, the picture is separated from the rest of the material. No useful negative is produced.

According to Dr. Jarrett, "a photographic film is an entity which used in a proper mechanism will record a light image on exposure." It does not have to be of any particular material and it makes no difference whether it produces a positive or a negative or both.

The witness was familiar with various types of film, samples of which were received in evidence as exhibits 5 through 10. He said that exhibits 5 and 6 are products of the Polaroid Corporation, exhibit 5 having a film base of cellulosic ester and exhibit 6 having one of paper. Exhibit 7 consists of 2 rolls of Kodak Verichrome panchromatic film, having a plastic chrome base, producing a negative image. Exhibit 8 uses a process similar to the Polaroid process. It has a plastic substrate and does not produce a useful negative. Exhibit 9 is a color transparency roll "which does not take a negative image, but rather takes a direct positive image, which is shown by a subsequent processing after exposure of the material". No negative is available. Exhibit 10 is a cartridge of color slide film for an Instamatic camera, which produces positive material directly on processing.

Types of film include roll film, pack film, cartridge film, package cartridge film, and sheet film.

In the opinion of the witness, the merchandise involved herein is photographic film because it is a unit which together with the proper camera will record light to make pictures. It is sensitized because exposure to light will produce an image. It has not been exposed and it is not motion-picture film.

There was introduced in evidence as exhibit A, patent 2,543,181, granted February 27, 1951, to Edwin H. Land, assignor to Polaroid Corporation, for a photographic product comprising a rupturable container carrying a photographic processing liquid. Dr. Jarrett testified that it is the basic patent for Land photography and covers type 20 film, among other products. He said that initially it was a process patent but that through commercial practice, it has become a product patent.

Dr. Jarrett stated that photographic film used in a camera will produce light images on exposure to light and that it is immaterial whether the images be positive or negative. He said that a film transparency is the end product of a film which will give projection transparency and that a film which is not transparent to light is not an end product. No photographic film is transparent to light. It absorbs light. Slides that are put into a projection machine are no longer photographic film. A print made from a negative is not a photographic film. A photographic print can be an end product of a photographic film, but there is a distinction between the two.

Stanley M. Cohen, manager of sales administration of the Polaroid Corporation, testified that his duties include sales management, sales promotion, and price coordination. He had previously been dealer-service manager, in which capacity he was directly involved with salesmen, photographic dealers, customers and camera owners. He teaches photographic science to sales personnel and attends trade exhibits and shows and meetings of the National Association of Photographic Manufacturers. He has been involved in the sales of the four categories of Polaroid film,—roll film, pack film, sheet film, and x-ray film.

Mr. Cohen said he was familiar with the terminology used in the purchase and sale of articles, such as exhibit 1, and stated that they are and always have been sold as type 20 film. In support of this statement there were introduced into evidence several groups of documents,

including trade literature, price lists, catalogues, ad mats, orders, magazine articles, letters from Polaroid camera owners, replies and "picture tips" from the Polaroid Corporation, and newspaper advertisements. (Exhibits 11 through 17).

Mr. Cohen stated that in his opinion exhibit 1 is a photographic film. He refers to it as film, has never referred to it in any other way, and has never heard anyone else refer to it otherwise except during the course of the trial. When he has occasion to buy any, he asks for type 20 film.

His definition of photographic film is a material which is light sensitive and can be used to record an image. Silver halide material made up of salts of either silver bromide, silver iodide or silver chloride, or a combination thereof, suspended in gelatin and coated in total darkness on a material would make a light sensitive photographic film.

■ In the instant case the merchandise was classified as articles of paper, coated, and is claimed to be dutiable as photographic film, sensitized but not exposed. It is well settled that an *eo nomine* designation must, in the absence of a clear contrary legislative intent, be preferred to terms of general description and enumerations which are broader in scope and less specific. United States v. Astra Trading Corp., 44 CCPA 8, 11, C.A.D. 627 (1956). Thus, if this merchandise is photographic film, it is more specifically provided for as such under item 723.15, *supra.*

Plaintiff claims that type 20 film is such photographic film on the ground that the designation for photographic film, sensitized but not exposed, is an *eo nomine* designation without limitation or shown contrary legislative intent; that it encompasses all types of photographic film, sensitized and not exposed, except motion-picture film, and that type 20 film is a particular type of photographic film for use in a specific camera.

Defendant contends, on the other hand, that the merchandise, as imported, contains sensitized but not exposed photographic film and also photographic paper, and that it is therefore more than either photographic film or photographic paper.

It is obvious that the imported merchandise is different from the well-known type of roll film, such as exhibit 8, long used in many types and makes of cameras. Such film consists of a thin coating of a light sensitive emulsion on a flexible base. When properly placed in a camera and the picture snapped, an image is formed on the film. After the roll has been removed from the camera and developed, negatives are produced. From the negatives pictures on photographic paper can be printed. Funk & Wagnalls New Standard Dictionary (1956), definitions of "film" and "photography"; Kirk-Othmer, Encyclopedia of Chemical Technology, Vol. 10, p. 542; The Encyclopedia Americana, Vol. 22, p. 1; American Mechanographic Corp. et al. v. United States, 25 Cust.Ct. 261, Abstract 54627 (1950).

The instant product allows all these processes to be carried out in less than a minute after the picture is snapped, by means of the photographic processing liquid contained in the pod which, when the film is pulled out and the pods ruptured, develops the film in about 15 seconds. Then the portion of the roll on which the picture has been recorded is torn off and the print separated from the rest of the material, which is thrown away.

In both cases the end product is the print. In the course of the first process, a negative is produced from which numerous pictures may be printed, while in the second only one picture and no useful negative are obtained.

It is clear that type 20 film contains sensitized material on which an image is formed when it is exposed in a camera, but it also contains developing fluid and coated photographic paper on which a picture is produced. It differs from the conventional type of photographic film and produces something other than the negative of conventional film.

Polaroid Land photography is a new photographic technique first announced by its inventor E. H. Land in 1947. The

Encyclopedia Americana, Vol. 22, p. 6; McGraw Hill Encyclopedia of Science and Technology, Vol. 10, p. 158; The Harper Encyclopedia of Science, Vol. 3, p. 916; Neblette, Photography, Its Materials and Processes (1952), pp. 234, 239–240. Neblette points out that the inventor sought a system of photography which he described as follows:

a camera and a photographic process that would produce a finished positive print, directly from the camera, immediately after exposure. From the point of view of the user, the camera was to look essentially like an ordinary camera, process was to be dry; the film was to be loaded in one of the usual ways, the positive print was to look essentially like a conventional paper print, and this print was to be completed within a minute or two after the picture was taken.

The authorities above cited refer to the product used in the Polaroid camera as film. In the Harper Encyclopedia, it is stated (Vol. 3, p. 916):

&#42; &#42; &#42; American general-use *films* such as Ansco, Super Hypan, Kodak Tri-X and Plus-X Pan, and *Polaroid 3000* embody many of these improvements; foreign manufacturers offer comparable products. &#42; &#42; &#42; The Polaroid-Land camera *with its film* is a photographic system in itself. &#42; &#42; (Emphasis supplied)

Defendant places considerable reliance on the language of the patent in which the claims refer to "a photographic product" or "a product." The descriptive language uses also the terms "novel film means," "novel photographic material," "novel composite product," and "novel film." The latter term appears in the following paragraph, for instance (column 4, lines 1–13):

In a preferred form the novel film of the present invention comprises a photosensitive layer, as for example, a silver halide-gelatin emulsion, means for developing a latent image formed in said photosensitive layer and means for forming a positive image in said

film as a product of the development of said photosensitive layer, said positive image being formed either in the photosensitive layer or in another layer of the film. The material in which the positive image is formed may be so attached to the film as to be readily stripped therefrom after formation of the positive image.

Whatever the terms of the patent, it is clear from the evidence in this case that this merchandise is bought and sold, advertised and described as film. The literature produced by the Polaroid Corporation, order forms, and advertising refer to the merchandise as type 20 Swinger film or type 20 Land film. Other products of the Polaroid Corporation which serve the same purpose in other Polaroid cameras are referred to as Polaroid film or Polaroid Land film. Customers call this merchandise film and the sheets prepared by the Polaroid Corporation as "picture tips" sent to camera users employ the word "film" consistently. Magazine and newspaper articles, not prepared by the Polaroid Corporation, refer to the product used with the Swinger camera as film or roll film. It is a matter of common knowledge, of which the court may take judicial notice, that the products used in Polaroid cameras are popularly called Polaroid film and are sold at film counters in photography and other shops. While the word "film" *per se* has many meanings, when used in connection with cameras and to designate products used in cameras to take pictures, obviously photographic film is meant. Evidence of commercial practice has probative value in determining the character of merchandise. Davis Products, Inc., et al. v. United States, 59 Cust.Ct. 226, C.D. 3127 (1967).

Tariff terms, in the absence of contrary legislative intent, are to be construed according to common and commercial understanding, not scientific meaning. Meyer & Lange et al. v. United States, 6 Ct.Cust.App. 181, T.D. 35436 (1915); United States v. Sandoz Chemical Works, Inc., 46 CCPA 115, C.A.D. 711 (1959); United States v. Victoria

Gin Co., Inc., et al., 48 CCPA 33, C.A.D. 759 (1960). The object of a tariff act is to classify substances according to the general usage and denomination of trade. Nylos Trading Company v. United States, 37 CCPA 71, C.A.D. 422 (1949).

■ The meaning of an *eo nomine* designation in a tariff act must be determined as of the date of the enactment of the act, but since tariff acts are made for the future, that meaning will embrace all subsequently created articles which possess an essential resemblance to the ones named in the statute and will include all forms of the article as they are developed. Davies Turner & Co. v. United States, 45 CCPA 39, C.A.D. 669 (1957); New York Merchandise Co., Inc. v. United States, 62 Cust.Ct. 283, 290, C.D. 3746, 305 F.Supp. 25 (1969), aff'd 58 CCPA, C.A.D. 1004 (1970); Astra Trading Corp. v. United States, 56 Cust.Ct. 555, C.D. 2703 (1966).

■ In Robert Bosch Corp. et al. v. United States, 63 Cust.Ct. 96, C.D. 3881 (1969), it was pointed out that where an article is something other than that described by a specific statutory provision, it is not classifiable thereunder, but that where the difference is in the nature of an improvement or amplification and the essential character is preserved and only incidentally altered, the rule that an *eo nomine* designation includes all forms of the article is applicable.

In J. E. Bernard & Co., Inc., et al. v. United States, 52 Cust.Ct. 56, C.D. 2436 (1964), it was held that reciprocating tools, called diamond files, made of steel and having a cutting face of diamond, were classifiable as files or rasps. The court stated (p. 60):

* * * They are files, or rasps, within the common meaning of the term, both in appearance and in use. To be sure, the points which are the distinguishing feature of a rasp, are created in these tools by a new technology which was unknown, or little known, in 1930. There is no evidence whatever that Congress intended to limit the term "rasp" to a tool with points made by the then method of manufacture. An improved rasp, with points made in a different manner, so as to be more efficient in certain applications, but used in the same manner as the 1930 rasp, is also a rasp for purposes of tariff classification.

In Kaysons Import Corp. v. United States, 56 Cust.Ct. 146, C.D. 2622 (1966), it was held that merchandise, described as automatic or electric toothbrushes, was classifiable under the provision for toothbrushes. The court said (p. 150):

Plaintiff in the instant case claims that the imported electric toothbrush is more than a toothbrush since allegedly it massages the gums as well as brushes the teeth. It is shown, as might be expected, that the vibratory motion of the article in use is unlike that imparted to a hand toothbrush by the user's arm. * * * No electric brush * * * exactly duplicates the motion and effect of a hand counterpart. The issue is whether the involved articles are known commonly and in the trade and commerce of the United States as toothbrushes. Nylos Trading Company v. United States, 37 CCPA 71, C.A.D. 422. Congress legislated for the future and is presumed to have intended to cover all forms of the article, including improved models not known in 1930. J. E. Bernard & Co., Inc., et al. v. United States, 52 Cust.Ct. 56, C.D. 2436; United States v. L. A. Salomon & Bro., 22 CCPA 490, T.D. 47483. * * *

In the instant case, Polaroid film (though perhaps not type 20) was in existence at the time of the enactment of the Tariff Schedules, though it does not appear that this was specifically called to the attention of Congress. The Tariff Classification Study of November 15, 1960 (schedule 7, p. 176) states merely:

Items 723.05–723.15, 723.25 and 723.30 would continue, without rate changes, the provisions for photographic film, dry plates, for photographic paper, respectively.

The Summaries of Tariff Information, 1948, are not helpful in determining

whether Polaroid film was intended to be included under provisions for photographic film since they were prepared at about the time the invention of Land photography was first announced; certainly before there could have been much, if any, commercial dealings with the Polaroid camera or its film.

Neither is the passage in the explanatory notes to the Brussels Nomenclature, quoted in plaintiff's brief, helpful, since the portion particularly relied on by plaintiff, apparently taken from the Sixth Impression of June, 1969, does not appear in the earlier editions which the drafters of the Tariff Schedules had before them when preparing the statute and which Congress had before it at the time of enactment.

However, an examination of schedule 7, part 2F, and the opening paragraph of the explanatory material with reference to said subpart in the Tariff Classification Study, schedule 7, p. 173, indicate that subpart F was intended to have a broad coverage including a wide variety of articles considered to be photographic equipment or photographic supplies. In our view it was the intent of Congress to place within the provisions for photographic film, sensitized but not exposed, merchandise, such as exhibit 1, which is designed for and used in a camera for the taking of pictures and is bought, sold and known in the trade and in common speech as film or Polaroid film or type 20 film. To the dealer and to the camera user this is but an improved type of film which will produce the end product of the photographic process—a picture—without the necessity of home or commercial developing and printing. Although it is a more sophisticated version of the article, it is still photographic film in common and commercial understanding.

We conclude that the Polaroid Land type 20 film involved herein is a type of photographic film for tariff purposes and is properly dutiable at 6.25 per centum ad valorem under item 723.15 of the Tariff Schedules, as photographic film, sensitized but not exposed, other than motion-picture film. To that ex-

tent the protest is sustained. As to all other merchandise and all other claims, the protest having been abandoned, is dismissed. Judgment will be entered accordingly.

WATSON and MALETZ, JJ., concur.