OLIVETTI CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 81–7–00988

Before CARMAN, *Judge.*

OPINION AND ORDER

(Decided July 30, 1986)

*Sharretts, Paley, Carter & Blauvelt (Peter J. Baskin* and *Ned H. Marshak* at trial and on the brief) for the plaintiff.

*Richard K. Willard,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division (*Barbara Epstein* and *Veronica A. Perry* at trial and on the brief) for the defendant.

CARMAN, *Judge:* This case involves the proper tariff classification of plaintiff's electronic typewriters known as the ET 201 and ET 221, imported from Italy during 1979 and 1980. The United States Customs Service (Customs) classified the typewriters under item 676.07, Tariff Schedules of the United States (TSUS), as other typewriters not incorporating a calculating mechanism. Plaintiff claims that they should instead be classified under item 676.05, TSUS, as non-automatic typewriters with hand-operated keyboard, not incorporating a calculating mechanism.

The relevant tariff provisions follow:

SCHEDULE 6, PART 4, SUBPART G

Typewriters not incorporating a calculating mechanism:

[claimed under]

676.05     Non-automatic with hand-oper- ated keyboard ................. Free

[classified under]

676.07     Other ...........................4.7% or 5.1% *ad val.*, depending upon date of entry

The Court concludes that plaintiff has failed to overcome the presumption that Customs correctly classified the ET 201 and ET 221 as other typewriters under item 676.07, TSUS. *See* 28 U.S.C. § 2639 (1982) (presumption of correctness).

DISCUSSION

The imported articles are the ET 201 and ET 221 electronic typewriters, samples of which were introduced into evidence at the trial. The ET 201 and ET 221 are substantially similar in all respects except that the ET 221 has a 15-character display. Neither party argued that the presence of the display was material to the Court's determination. For convenience and brevity, both parties in their briefs referred to both models as the ET 221. The Court will do the same, with the understanding that when the ET 221 is mentioned, both the ET 201 and ET 221 are meant.

The ET 221 contains an internally housed electronic microchip which gives it a memory capable of storing 1000 characters: 170 characters are devoted to storing format commands such as margins and tabs and the remaining 830 characters can be used to store either page formats[1] or text. By depressing two keys, the operator recalls text stored in the memory, which the ET 221 then types without further operation of the keyboard. The memory is non-volatile, that is it remains intact even when the typewriter is turned off. The operator can make corrections and changes to the text while keying it, but once text is entered in the memory the operator cannot delete or rearrange it. The operator can, however, add text to the end of the stored material.

Material can be stored in the memory in a maximum of ten different segments, each activated by the two-key code, or the entire memory can be used for one text segment. Plaintiff advertises this feature as useful for repetitively typing small blocks of text such as dates, addresses, and signature blocks. *See* Defendant's Exhibit C at 3R. The memory could also be used to store a short form letter that did not exceed 830 characters.

---

[1] Page formats position paper in the typewriter so that the operator can type variable information on a preprinted form.

The issue addressed at trial was whether the ET 221 is an "automatic typewriter" as that term was understood when the relevant tariff provisions were enacted in 1963. The term automatic typewriter is no longer in commercial or common usage, Record 167, 294, and the inquiry must therefore focus on the scope and meaning of the term in the early 1960's. If the ET 221 is an automatic typewriter, then it cannot be classified as a non-automatic typewriter under item 676.05, but falls instead within the basket provision for other typewriters, item 676.07.

The automatic typewriters that existed when Congress created the basket provision stored text using a punched paper tape. They had some editing capabilities and virtually unlimited storage capacity. Plaintiff's position is that the successors to these paper tape machines were typing machines using magnetic storage media, which ultimately evolved into word processors. The ET 221 is not the successor to these early typing machines, plaintiff maintains, but rather to the early standard manual and electric office typewriters. More specifically, it is plaintiff's position that the ET 221 resembles standard typewriters and does not resemble automatic typewriters. Defendant for its part contends that because the ET 221 is capable of reproducing typewritten text without the hand operation of the keyboard, it is an automatic typewriter as that term was meant by Congress.

In determining the correct classification of the ET 221, the Court is guided by certain well-established principles. The first is that "[t]ariff terms are written for the future as well as the present," *United States* v. *Standard Surplus Sales, Inc.,* 69 CCPA 34, 38, 667 F.2d 1011, 1014 (1981), and therefore encompass articles that were unknown to commerce at the time of enactment. The second is that a subsequently created article fits within the tariff provision so long as "the article possesses an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification." *Smillie & Co.* v. *United States,* 12 Ct. Cust. Appls. 365, 367, T.D. 40520 (1924). The inquiry here must therefore be whether the ET 221 bears an essential resemblance to the automatic typewriters Congress sought to provide for in the basket provision, item 676.07.

To determine the scope of the respective tariff provisions the Court may examine the *Tariff Classification Study Explanatory Notes and Background Materials,* Schedule 6, Part 4 (1960) (TCS)[2] which states at page 273:

> Items 676.05 and 676.07 provide for typewriters not incorporating a calculating mechanism. No rate changes are involved. The provision in item 676.05 covers the typewriters presently free of duty under paragraph 1791. Such typewriters may be of the electric or nonelectric types but do not include typewriters

---

[2] The TCS is generally regarded as an authoritative source for determining legislative intent. *See Nippon Kogaku (USA), Inc.* v. *United States,* 69 CCPA 89, 93, 673 F.2d 380 (1982).

> which produce typewritten material by means of precut stencils, or otherwise, without the hand operation of the keyboard.

Congress thus described automatic typewriters as machines that could produce text without the operator actually striking the corresponding keys on a keyboard, regardless of the means. This ability is the particular that Congress established as the essential criterion of the classification.

The Court concludes that because the ET 221 is capable of producing typewritten text from memory without the hand operation of the keyboard, *see* Pretrial Order, Schedule C, Stipulated Fact 11, it bears an essential resemblance to the automatic typewriters item 676.07 was designed to cover.[3] Although this is the essential criterion for classification in item 676.07, the Court further finds that the ET 221 resembles automatic typewriters in other important respects such as limited editing ability and use in performing repetitive typing tasks.

Both automatic typewriters and the ET 221 have a limited editing capability. The automatic typewriters that existed in 1963 stored text on a paper tape. As the typist keyed the text the typewriter punched holes into the paper tape. Mistakes could be corrected by striking out portions of the tape, but the only way to insert a correction or new material was to physically cut out the section of tape representing the page where the correction was desired and splice in a new section. Record 246–47. In addition, the automatic typewriters could be stopped and the typist could manually type insert material. The editing ability of these machines was clearly limited and the process cumbersome.

The ET 221 also has limited editing capabilities. The operator can make any additions, deletions, or changes in the text after it is keyed but before it is placed in the memory. This is in some respects similar to the operator's ability with an automatic typewriter to strike out mistakes that were immediately discovered. Also like the automatic typewriter, the ET 221 can stop at a given point in the text, because of the segmentation of the memory, after which the operator can type variable information and can then recall another memory segment if desired. The only limitation of the ET 221 not found in automatic typewriters is that once text is stored in a memory segment the operator cannot delete a portion of it without disturbing the surrounding text (as a portion of text in a paper tape can be struck out) or insert new material (as a new page or pages can be spliced into a paper tape). To the extent that editing ability is a criterion of classification under item 676.07, this limitation is not significant enough to remove the ET 221 from its coverage.

---

[3] The Court is also unpersuaded by plaintiff's argument based upon the evolution of automatic typewriters into today's word processors. There is an entirely separate tariff classification for word processors and neither party suggested that the ET 221 belonged in it. Moreover, the appropriate focus of the inquiry is not the evolution of automatic typewriters but their essential characteristics and whether the ET 221 resembles them in those essentials.

Another similarity between the ET 221 and automatic typewriters is the kind of tasks they perform. Both machines are used for repetitive typing tasks, thereby making the operator more efficient. At trial plaintiff made much of the fact that automatic typewriters were used for repetitively typing lengthy documents, while the memory of the ET 221 is useful only for typing short items such as signature blocks or short paragaphs. The essence of the use of the memory in both machines, however, is to repetitively reproduce typed material without the operator being required to type it.[4] The memory of the ET 221 can also be used to store page formats, which position paper on the carriage to allow the operator to fill in blanks on preprinted forms. Automatic typewriters had the same ability and were also used for this task. Record 236–37. As with automatic typewriters, the ET 221 makes office workers more efficient, freeing them for other tasks.

Automatic typewriters were capable of repetitively typing long documents because their storage medium was external and their storage capacity was virtually limitless. The ET 221 cannot reproduce lengthy documents because its memory has a total limit of 830 characters. It is not necessary, however, that a product be capable of performing the same range of functions before it can be said to bear an essential resemblance to an earlier product. Courts generally apply the maxim that tariff provisions are made for the future when improved products are developed that have expanded capacities, see e.g., *Polaroid Corp.* v. *United States*, 66 Cust. Ct. 116, C.D. 4179 (1971) (film with developing chemicals still classifiable as unexposed film), but it is equally applicable when the new products have diminished capacities. The essence of an automatic typewriter is its ability to type text without an operator striking the corresponding keys. The ET 221 has this ability, although the amount of text it can type is less than automatic typewriters of the 1960's could type.

This ability to reproduce text without the operator typing it is also what distinguishes the ET 221 from other electronic typewriters with automatic features that Customs has classified as non-automatic under item 676.05. *See* Record 120–21. These other typewriters have automatic features such as margins, tabbing, and centering, but cannot automatically type text without hand operation of the keyboard. The *Tariff Classification Study* identifies automatic typewriters as those that "produce typewritten material" automatically. Customs has drawn a distinction between typewriters that cannot automatically type words on the page and those that can, without regard to other automatic functions. This distinction is reasonable; Customs' classification of these other typewriters as non-au-

---

[4] At trial plaintiff attempted to show that the memory of the ET 221 is one of many convenient automatic features and that the ET 221's ability to perform repetitive typing tasks is not a significant selling point. Evidence at trial, however, showed that the memory of the ET 221 is a significant feature: The ET 221 is priced significantly higher than the ET 121, which has some automatic functions such as margins and tabbing, but cannot automatically type text. Record 37–39, Plaintiff's Exhibit 18.

tomatic does not compel the conclusion that the ET 221 should also be classified as non-automatic.

Finally, the presence of a hand operated keyboard on the ET 221 does not remove it from the classification for automatic typewriters or place it within the classification for "non-automatic with hand operated keyboard" typewriters. The early paper tape automatic typewriters also contained a hand operated keyboard and could function as standard typewriters. Record 99. Moreover, although non-automatic standard typewriters have hand operated keyboards, the ET 221 is distinguishable from typewriters in this classification because of its ability to type text without hand operation of the keyboard. This automatic ability is not merely an improvement upon standard typewriters such as would allow the ET 221 to be included in item 676.05 as an improved version of the standard typewriter. *Compare, e.g., Astra Trading Corp.* v. *United States,* 56 Cust. Ct. 555, C.D. 2703 (1966) (screwdriver with light is improved version of screwdriver). Typewriters with an automatic ability were expressly excluded from item 676.05, TSUS. *See Tariff Classification Study,* Schedule 6, Part 4, at 273. An *eo nomine* designation includes all forms of an article only when there are no limitations or a demonstrated contrary legislative intent. *Nootka Packing Co.* v. *United States,* 22 CCPA 464, 470, T.D. 47464 (1935).

Plaintiff has failed to overcome the presumption that Customs' classification of the ET 221 as an automatic typewriter is correct. The Court therefore finds that the ET 221 is correctly classified under item 676.07, TSUS.